D. A. THOMSON, Plaintiff, v. R. W. HOLT, Commissioner of Finance of the State, in Charge of the Property and Business of the LACLEDE TRUST COMPANY, of St. Louis, a Corporation, Defendant, Appellant. No. 35,990.

F. W. LINN, Plaintiff, v. R. W. HOLT, Commissioner of Finance of Missouri, in Charge of the Property and Business of LACLEDE TRUST COMPANY, of St. Louis, a Corporation, Defendant, Appellant. No. 36,041.

ANNA M. MUELLER, PHILLIP SCHMIDT and WILLIAM G. MUELLER, JR., Executrix and Executors of the Estate of WILLIAM G. MUELLER, Plaintiffs, v. R. W. HOLT, Commissioner of Finance of Missouri, in Charge of the Property and Business of LACLEDE TRUST COMPANY, of St. Louis, a Corporation, Defendant, Appellant. No. 36,043.

ST. LOUIS UNION TRUST COMPANY, a Corporation, and THOMAS A. BEHAN, Trustees of the Estate of LOUISA DACEY, Assignees of JAKIEMD INVESTMENT COMPANY, a Corporation, JAMES DACEY, JR., and JOHN F. REARDON, Plaintiffs, v. R. W. HOLT, Commissioner of Finance of Missouri, in Charge of the Property and Business of LACLEDE TRUST COMPANY, of St. Louis, a Corporation, Defendant, Appellant.—132 S. W. (2d) 974. No. 36,051.

Court en Banc, November 7, 1939.

*Carter & Jones* and *Joseph Renard* for appellant.

298

*Eagleton, Waechter, Elam & Clark* and *Edward W. Tobin* for respondents.

TIPTON, C. J.—By stipulation between the parties of these cases, the Thomson case will dispose of the others.

The Circuit Court of the City of St. Louis allowed a preferred claim against the assets of the defunct Laclede Trust Company whose affairs were in charge of the appellant as Commissioner of Finance of Missouri, in favor of the respondent in the sum of $10,000 and interest. From this decree the appellant has duly appealed.

On August 8, 1931, the examiners of the Finance Department of this State concluded an examination of the Laclede Trust Company of St. Louis (hereinafter referred to as the Trust Company), a banking institution in the city of St. Louis, Missouri. The results of this examination disclosed that, although the examiners considered the bank solvent, they found (among other things) that the Trust Company's bond account had a book value of $880,302.94 and a market value of only $746,598.17, or a depreciation of $133,704.77 due to a depressed bond market. In their report, the examiners made the following recommendations:

"Your Examiner recommends that $66,000 in cash be subscribed immediately by the directors or stockholding interests, to provide for estimated depreciation on defaulted and substandard bonds and losses on loans and that the Trust Company continue to set aside $1000 monthly to reserve for bond depreciation and discontinue dividend payments."

In connection with this recommendation, eight directors of the Trust Company entered into the following agreement with the Trust Company:

"The Laclede Trust Company, St. Louis, Missouri, on this, the 7th day of August, 1931, has received the sum of Sixty-Six Thousand ($66,000.00) Dollars of the following individual directors in amounts as follows, to-wit:

| | |
|---|---|
| Wm. G. Mueller | $10,000.00 |
| J. A. Dacey, Jr. | 20,000.00 |
| Eugene F. Olszowski | 3,000.00 |
| F. W. Linn | 10,000.00 |
| D. A. Thomson | 10,000.00 |
| J. C. Rodenberg | 5,000.00 |
| Geo. L. Zollmann | 3,000.00 |
| John J. Reardon | 5,000.00 |

and said amount has been deposited on said date with the Laclede Trust Company. It is understood and agreed between said Directors named and said Laclede Trust Company, that this said sum of Sixty-Six Thousand ($66,000.00) Dollars has been so deposited by above Directors for the purpose of taking up depreciation in the Bond Account of said Trust Company caused by present market conditions of bonds and is to be placed and kept by said Laclede Trust Company in a 'Special Guaranty Bond Reserve Account' to be then held until the Regular Reserve Bond Account has been increased to a sufficient amount to make up said depreciation so that there is no impairment of the capital or surplus of said Trust Company. At

the time when said such depreciation is made up and restored it it understood and agreed by said Trust Company and Directors, that said Sixty-Six Thousand ($66,000.00) Dollars is to be withdrawn by said Directors, their heirs, assigns or legal representatives in accordance with the sums advanced by each of them.

"A copy of any assignment of the respective interests from a Director must be served on said Trust Company within ten days after date of assignment to hold said Trust Company to notice.

"It is also understood and agreed that a copy of this instrument signed by said Trust Company shall be given each Director named herein, and this agreement spread on the minutes of the meeting of the Board of Directors of said Trust Company and made a part thereof.

"This agreement is to be submitted to the State Finance Commissioner for his consideration and approval and it is further understood and agreed that no withdrawals will be made from this 'Special Guaranty Bond Reserve Account' by said Directors, their heirs, assigns or legal representatives until such withdrawals are first submitted and approved by the State Finance Commissioner of the State of Missouri."

Pursuant to this contract, the eight directors did place $66,000 in the bank, each director subscribing the amount as shown in the contract. On August 17, 1931, S. L. Cantley, the then Finance Commissioner, approved the contract as shown by the following letter he wrote H. W. Kroeger, Vice-President of the Trust Company:

"I have your letter of the 13th instant, enclosing copy of a contract which you propose to enter into with your directors, whereby they will contribute $66,000.00 for the purpose of taking care of deflation in your bond account, the said directors to be reimbursed when the condition of the Trust Company will permit.

"I notice particularly that no reimbursements are to be made, excepting with the approval and by the direction of the Commissioner of Finance of the State of Missouri. Under those terms I am very glad, indeed, to approve of your arrangement and want you to know I appreciate very much the patriotic loyalty evidenced by your directors and others who have so freely contributed of their means to strengthen the institution."

On January 16, 1933, the Finance Commissioner of this State took possession and charge of the property and business of the Trust Company in conformity with the laws of Missouri. On that date the book value of the bond account was $674,355.13, and the actual market value of these securities was $356,274.60, or a difference between the book value and the market value of $318,080.53. Between that date and the date of the trial (April 28, 1937) in this cause, the Finance Commissioner sold securities in the bond account amounting to $444,303.26, and there were still securities in that account having a market value of $55,696.48, thereby showing an enhancement

of $143,725.14 in the value of bonds in the bond account caused by a rise in the market between the date the Trust Company was taken over and the date of trial.

The trial court's decree found that the $66,000 was a special deposit; that the title to it remained in the eight directors who were parties to the contract of August 7, 1931; that the Trust Company had no right, title or interest in or to said $66,000 other than the right to possession as bailee or trustee under the contract; and that at the time the contract was entered into the Trust Company was solvent. The decree further stated that the receipt contract was entered into ''in connection with a then existing impairment of $133,704.77 in the market value of the securities of the then regular reserve bond account of said Trust Company'' and that, by reason of the enhancement to the extent of $143,725.14 in the value of the bonds in the bond account between January 16, 1933, and shortly before the trial of this cause, the purpose for which the deposit was made was thereby accomplished and attained. The decree sustained the respondent's claim for the $10,000 deposited by him as a part of the aggregate sum of $66,000 as a preferred claim.

■ We do not agree with the trial court that the money placed in the Trust Company under the contract of August 7, 1931, constituted a special deposit. A ''special deposit'' implies the custody of the property without the authority of the custodian to use it, and the right of the owner to receive back the identical thing deposited. If a bank does commingle the money of a special deposit with the money in its general deposit without the right to do so, this cannot make the special deposit a general one. [Security Natl. Bank Savings & Trust Co. v. Moberly, 340 Mo. 95, 101 S. W. (2d) 33; City of Fulton v. Home Trust Co., 336 Mo. 239, 78 S. W. (2d) 445; Paul v. Draper, 158 Mo. 197, 59 S. W. 77.]

■ The sum of $66,000 was subscribed by the directors immediately following the report of the examiners in which they recommended that this be done to provide for an estimated depreciation on defaulted bonds held by the Trust Company. Ordinarily, '' 'where stockholders voluntarily assessed themselves to relieve the corporation from pecuniary embarrassment, or for the betterment of their stock, such advancements are not debts, but assets of the corporation.' '' But ''it does not follow that such payments may not be made under a valid and binding agreement that they are to constitute debts of the corporation which should be repaid.'' [State ex rel. Gordon v. Trimble, 318 Mo. 341, 346, 300 S. W. 475, l. c. 477 and 478.] We, therefore, look to the receipt of August 7, 1931, to see under what conditions this money was placed in the Trust Company and under what conditions it would be returned to the subscribing directors.

■ As expressed in this contract, the object of the deposit was ''for the purpose of taking up depreciation in the Bond Account of said Trust Company caused by present market conditions of bonds.''

The money was to be returned to the subscribing directors when and only when the depreciation in the bond account was made up and restored, and then only after the approval of the State Finance Commissioner was obtained. The purpose for subscribing this sum could not have been attained if the money subscribed by these directors were a special deposit. If this were a special deposit, then the Trust Company could not have used the money or commingled it with its other funds. It would in no way have increased the solvency of the Trust Company. If title to the specific money placed in the Trust Company did not pass to it, how could the bond account have been improved? Would the Trust Company's solvency have been increased if the directors had obtained new customers on August 7, 1931, who deposited $66,000? These questions answer themselves. A contract must be interpreted as a whole to arrive at its meaning. It will not do to say that because the contract provided that the $66,000 was "to be *placed* and *kept* by said Laclede Trust Company in a 'Special Guaranty Bond Reserve Account'" that the title did not pass to the Trust Company. Moreover, the contract was not to be effective until the Finance Commissioner had approved it. He understood that this sum was a contribution to the capital. In his letter of approval, he said, "I have your letter of the 13th, instant, enclosing copy of a contract which you propose to enter into with your directors, whereby they will contribute $66,000 for the purpose of taking care of deflation in your bond account," which shows this to be true. The letter further stated that these directors would be reimbursed only with the approval of the Finance Commissioner, which approval was never given. "The purpose of the assessment was so clearly to immediately increase the solvency of the bank, which a special and conditional deposit would not have done, that a court would not be justified in finding to the contrary." [Fallgatter v. Citizens' Natl. Bank, 11 Fed. (2d) 383, l. c. 386.]

The trial court found that the purpose for which the deposit was made was accomplished and attained. If this were so, then the respondent would be entitled to the return of his share of the deposit; however, we do not believe the facts, viewed in the light most favorable to the respondent, justify any such conclusion. The facts may be summarized as follows:

Book Value of Bond Account, August, 1931 ............$880,302.94
Book Value of Bond Account, January, 1933 ............ 674,355.13

Bonds Sold Between August, 1931 & January, 1933 ...... 205,947.81
Bonds Sold After January, 1933 ..................... 444,303.26
Market Value of Bonds on Hand at Date of Trial ...... 55,696.48

Total of Bonds Sold (and Left on Hand) .............$705,947.55

From the above we see that the market value of bonds sold and left

on hand was $705,947.55, or a net loss from the book value of August, 1931, of $174,355.39. It is true that from January, 1933, to shortly before the trial the bonds did appreciate $143,725.14, but the market value of the bonds in January, 1933, was only $356,274.60, or a depreciation of $318,080.53.

The respondent contends that the phrases "said depreciation" and "said such depreciation" as used in the receipt contract refer only to the first depreciation, to-wit: $133,704.77, as shown in August, 1931, and to no future depreciation, and when the bond appreciation from the second depreciation or their lowest market value was $143,725.14 that the contract was fulfilled. He makes this contention in the face of the fact that at no time after the contract was executed did the market value of the bonds equal the book value. Add the appreciation after January, 1933, to the market value of the bonds of that date and we find the market value is $174,355.39 less than the book value. We hold that the respondent has failed to sustain the burden of proof that the depreciation in the bond account was made up and restored as provided in the receipt contract.

■ Respondent's second ground to sustain the decree of the trial court is stated as follows:

"Even if the purpose of the receipt contract had not been attained and accomplished by the aforesaid enhancement in value of the bond account to the extent of $143,725.14, the $66,000.00 deposited as aforesaid constituted a trust fund for the purpose specifically recited in the receipt contract, and if the accomplishment of such purpose were prevented by the taking over of the Trust Company for liquidation, that would not operate as a forfeiture of the rights of the depositing directors in such trust fund."

In the very recent cases of Asher v. West End Bank et al., No. 35,547, and Castlen v. West End Bank et al., No. 35,550, 345 Mo. 89, 131 S. W. (2d) 549, which were consolidated, we ruled the same contention against a director of a defunct bank. The directors in those cases relied upon the same authorities respondent relies upon in this case. On authority of the Asher and Castlen cases, we hold that as to this point the respondent cannot be sustained.

■ Respondent next contends that Sections 5312, 5313 and 5315, Revised Statutes 1929, entitles these directors to a statutory lien upon the proceeds of the Trust Company's bond account. The pertinent parts of these sections are as follows:

"Sec. 5312. Whenever the commissioner of finance shall determine that the capital of any bank or trust company organized under the laws of this State is impaired, such bank or trust company may, through its board of directors, with the written consent of the commissioner of finance, issue and sell at par certificates of indebtedness in the aggregate amount of such impairment of capital according to the estimate of the commissioner of finance, for the purpose of furnishing security to the creditors of such bank or trust company against

loss as a result of such impairment of capital. Such certificates of indebtedness may be sold for cash or, with the written consent of the commissioner of finance, for promissory notes, and they shall be of the nature specified in, and conform to the requirements of, the several provisions of sections 5312 to 5315.''

''Sec. 5313. Such certificates of indebtedness shall be in such denominations, shall bear such rate of interest, not exceeding 6 per cent, and shall mature at such time, not later in any event than twelve months from the date authority is given for their issuance, as the board of directors of such bank or trust company, with the approval of the commissioner of finance, may determine. If the impairment of capital causing the issuance of such certificates of indebtedness exists by reason of the determination by the commissioner of finance that certain assets of such bank or trust company are of doubtful value, uncollectible, or otherwise objectionable, the assets so determined to be of doubtful value, uncollectible, or otherwise objectionable, shall upon the issuance of such certificates of indebtedness, be set apart from the other assets of such bank or trust company and shall thereafter be held by it for the purpose of selling, enforcing, collecting or adjusting the same for the use and benefit of the holders of such certificates of indebtedness, and all amounts realized from the sale, enforcement, collection or adjustment of any of such assets shall be devoted to the ratable payment of such certificates of indebtedness and interest thereon, as provided in section 5315. . . .''

''Sec. 5315. Upon the assets of any bank or trust company issuing certificates of indebtedness being set apart for the use and benefit of the holders of such certificates of indebtedness, as provided in section 5313, such bank or trust company shall proceed to collect and liquidate such assets and shall have full authority to sell or enter into any compromise concerning the same. All amounts received or collected by such bank or trust company from the sale, collection or adjustment of such assets shall be deposited and kept by it in a separate fund and accounts and all such amounts shall be held in trust for the use and benefit of the holders of such certificates of indebtedness. . . . In the event the commissioner of finance shall take possession of the business and property of any bank or trust company which has issued any such certificates of indebtedness, the assets of such bank or trust company which shall have been set aside for the use and benefit of the holders of such certificates as provided in section 5313 shall not be subject to the claims of other creditors of such bank or trust company until the amount owing on said certificates of indebtedness with accrued interest thereon to date of payment shall have been paid in full. . . .''

A mere reading of these sections will show that the contract of August 7, 1931, is not a certificate of indebtedness. Are we to understand that for $66,000, these directors required as security bonds with a present market value of $746,598.17? Would that not be a fraud on

the shareholders and depositors of the Trust Company? The letter of the Finance Commissioner does not even suggest that he approved the contract of August 7, 1931, as certificate of indebtedness. And these directors did not consider this contract a certificate of indebtedness; if they had, they would and should have repaid themselves when the $205,947.81 worth of bonds were sold between August, 1931, and January, 1933.

The fund of $66,000 was placed in the Trust Company for the very purpose of giving security to the deposits of the Trust Company. If the contract were construed so as to approve the claim of respondent as a general claim, it would be a fraud upon the creditors of the Trust Company. It would be pretending, for the purpose of securing depositors, that the fund of $66,000 was an asset when it was not an asset. The law does not tolerate such conduct. This respondent knew, as did the other directors, that this sum was needed and placed in the bank as an asset so it could continue in business. He knew it was not a deposit so as to create an obligation on the part of the bank, and which could be enforced to the detriment of the general creditors of the bank. It is true the directors were under no legal obligation to make this contribution, but they voluntarily assessed themselves so that the bank might operate on a more sound financial basis. Such voluntary assessment is supported by sufficient consideration. [See 95 A. L. R. 528, and notes thereunder.] While it is true the Trust Company was not insolvent in August, 1931, yet the $66,000 was placed in the Trust Company as assets to improve its solvency. Under the contract, the only way these directors would be entitled to a return of this money was when the market value of the bonds equalled the book value. That never happened.

It is, therefore, ordered that the judgment of the circuit court be reversed with directions to that court to dismiss respondent's petition, the same order to issue in cases numbers 36,041, 36,043 and 36,051. All concur.